**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **15-8378MJ** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 28, 2015 |
| **Ahmed Mohammed El Gammal,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE BRIDGET S. BADE, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**DETENTION HEARING**

**APPEARANCES:**
For the Plaintiff:
    U.S. Attorney's Office
    By:  **Ann B. Scheel**, Esq.
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004

For the Defendant:
    Mitchell Stein & Carey
    By:  **Michael T. Morrissey**, Esq.
    2 North Central Avenue, Suite 1900
    Phoenix, Arizona 85004

Transcriptionist:
Candy L. Potter
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1          THE CLERK:  Magistrate docket 15-8378, United States

2     of America versus Ahmed Mohammed El Gammal, on for a detention

3     hearing.

4          MS. SCHEEL:  Good afternoon, Your Honor, Ann Scheel on

5     behalf of the United States.

6          THE COURT:  Good afternoon, Miss Scheel.

7          MR. MORRISSEY:  Good afternoon, Your Honor, Michael

8     Morrissey on behalf of Mr. El Gammal, who is present.

9          THE COURT:  Good afternoon, Mr. Morrissey.

10          And good afternoon, Mr. El Gammal.

11          This is the time set for a detention hearing.

12          Miss Scheel, how does the Government wish to proceed?

13          MS. SCHEEL:  Your Honor, this case involves a

14     presumption under 18 U.S.C. 3142(e)(3)(C).  There's a -- there

15     is a presumption of both flight and danger, and we would like

16     to proceed under that understanding.

17          THE COURT:  All right.  Do you have witnesses to call

18     or are you proceeding by proffer?

19          MS. SCHEEL:  We will proceed by proffer.

20          THE COURT:  Please go ahead.

21          MS. SCHEEL:  Since this is strictly regarding the

22     detention hearing, I'm sure the Court's aware that the

23     defendant was indicted by the Southern District of New York

24     yesterday.

25          With regard to the issue of danger, if the

1  defendant -- if the Court finds the defendant is a danger to

2  the community, then there are no conditions sufficient to

3  ensure the safety of the community and a third-party custodian

4  is not an appropriate release condition.

5          Specifically, regarding danger we believe the Court

6  should consider the nature of the charges in this case, that

7  the defendant is accused of helping an Islamic extremist

8  American citizen travel to Syria to train and fight with ISIL.

9          Based on the Complaint and the facts in the Complaint,

10  the Court has sufficient evidence to evaluate the evidence that

11  this individual, this American citizen has traveled to Syria

12  and is currently training and fighting for ISIL.

13          Additionally, the defendant's criminal activity in

14  this case occurred mostly on-line through various social media

15  websites.  That can be conducted almost anywhere.  That

16  can -- that would be very hard for some -- for Pretrial

17  Services to control his access to social media if he is

18  released under any conditions.

19          The defendant appears to be highly motivated to

20  continue his support for ISIL.  He continues to have contact

21  with the individual who did travel to Syria.  I think that he

22  had contact with him as -- maybe two weeks ago on social media.

23          He has other overseas ties that are related to ISIL,

24  specifically a, I believe, co-conspirator 2 that was mentioned

25  in the Indictment who lives in Turkey.

1          He has posted numerous postings on various social

2  media communications that discuss his support of ISIL.

3          For example, the defendant has contacted this

4  co-conspirator who is currently in Syria, and that was in May

5  of this year.

6          MR. MORRISSEY:  Your Honor, I have an objection to

7  this, if it's outside the scope of the Indictment, being the

8  subject of a proffer.  There's no way for the Court to test the

9  reliability of it.  And I would ask if they wish to put that

10  evidence on that they proceed through a witness.  If it is

11  within the four corners of the Indictment, then I don't have an

12  objection.

13          MS. SCHEEL:  Well, Your Honor, this has to do with

14  defendant's dangerousness and his ability to flee.

15          THE COURT:  And what's the basis of the information

16  that you're offering by proffer?

17          MS. SCHEEL:  As stated in the Complaint, the FBI

18  obtained a search warrant of the defendant's Facebook and the

19  Facebook pages of his co-conspirators.  They updated that

20  Facebook page as recently as yesterday.  This is one of the

21  postings from his co-conspirator's Facebook page, it's a

22  communication between that co-conspirator in Syria and this

23  defendant.

24          MR. MORRISSEY:  Your Honor, then I would renew my

25  objection.  It's not in the Complaint if it's based on an

1   updated search warrant that was yesterday, because the

2   Complaint is several days ago.  The Indictment was yesterday.

3          THE COURT:  I'm going to overrule the objection.  The

4   Government can proceed by proffer.

5          MS. SCHEEL:  Thank you, Your Honor.

6          Specifically in the posts, which is in English, the

7   defendant asks the co-conspirator, is it easy to park a car

8   into your job parking lot?

9          And as the Court will find in the Complaint, I believe

10  it's paragraph 27 -- 26 in the Complaint, the co-conspirator

11  refers to his joining ISIL as a job.  He references bosses and

12  supervisors in ISIL.

13         So the Court can consider whether or not this

14  discussion is his discussion about joining ISIL or coming to

15  Syria for ISIL.

16         The defendant -- or this co-conspirator responds, I

17  don't know, I need to ask my superiors at work first,

18  inshallah.  But I think it's risky because the parking lot

19  these days is going under a lot of renovation, especially on

20  the north side.  Khair inshallah, you planning on driving any

21  time soon?

22         The defendant responds, yes, mid August, inshallah.

23  Check Facebook more often.

24         THE COURT:  So --

25         MS. SCHEEL:  Then the defendant asks the

1  co-conspirator to move to an encrypted social media platform

2  called surespot.

3          THE COURT:  When you refer to the co-conspirator, is

4  that the individual identified as CC-1 in the Complaint?

5          MS. SCHEEL:  I believe that -- that's the one that's

6  in Syria, I think that's CC-1.

7          THE COURT:  Well, there was an individual identified

8  in the Complaint as being in Turkey as CC-2.  CC-1 was the

9  American citizen who was alleged to have left the United

10 States.

11         MS. SCHEEL:  Yes.  I'm referring to CC-1.  CC-2 is a

12 resident of Turkey, he's an Egyptian citizen living in Turkey.

13         THE COURT:  So this information you're proffering is

14 based on updated information received from a search warrant

15 with respect to recent communications with CC-1?

16         MS. SCHEEL:  Yes.  It was on May 14th of this year.

17         THE COURT:  Was when the communication occurred?

18         MS. SCHEEL:  Yes.

19         The indication was that he planned to travel to

20 Turkey/Syria area in mid August.

21         This is also confirmed by another posting of the

22 defendant's Facebook, which we also obtained a search warrant

23 on.  It was communications with an individual named Marwa

24 El Gammal.  It was between March 1st, 2015, and April 28th,

25 2015, where he indicates -- we believe it's a relative, because

—— 15-8378MJ — August 28, 2015 ——

1  the woman's name is El Gammal, the last name.  Asking her if

2  she has a separate bank account in her name only.  She

3  indicates that she does and wants -- he indicates he's planning

4  on coming for a visit and wants to transfer money to her

5  because he can only take $10,000 with him across the border --

6  or no more than $10,000.  So he would like to transfer money to

7  her account.

8         Additionally, Your Honor, the defendant appears to

9  have acquired the means to carry out acts of violence.  He has

10 obtained and the agents did seize a drone, a quadcopter drone,

11 at the time of the search warrant of his residence.

12        In December -- between December 2014 and February 2015

13 he exchanged social media messages with an individual not named

14 in the Complaint in which they discussed the remote control

15 planes being able to carry cameras.

16        He also indicated to this individual that the devices

17 are good for Gaza, G-A-Z-A, the Gaza Strip, and that they can

18 be loaded with bombs.

19        The defendant -- or the FBI also recovered 100 rounds

20 of nine millimeter ammunition and a magazine from the

21 defendant's house at the time of the search warrant.

22        THE COURT:  Please state that again, Miss Scheel,

23 agents recovered?

24        MS. SCHEEL:  100 rounds of nine millimeter ammunition

25 and a magazine from the defendant's house.

1          THE COURT:  Were there any firearms?

2          MS. SCHEEL:  I'm sorry, what?

3          THE COURT:  Were there firearms or just the

4   ammunition?

5          MS. SCHEEL:  Just the ammunition.  No firearms were

6   located.

7          With regard to flight, the defendant's postings that

8   I've already informed the Court about indicate that he does

9   wish to travel.  He does wish to leave the United States.  He

10  plans on taking his money.  He has a substantial balance in his

11  bank account, as the Court's aware, that he intended to

12  transfer to a family member.

13         The defendant has no real family ties here.  His

14  mother recently came from Egypt.  She is a legal permanent

15  resident, but spends much of her year in Egypt.

16         His relatives, he indicated in the Pretrial Services'

17  report that he has a sister that lives in Dubai.

18         He apparently has some relative in Turkey that he

19  feels comfortable enough to transfer a substantial amount of

20  money to.

21         He has CC-2, who is living in Turkey that he is

22  continuing to have contact over social media.

23         And what appears to be as one of his few friends here

24  in the Phoenix area is planning on leaving and moving to

25  Palestine on Monday, and so he will have another contact

 1   overseas.

 2          His job is -- appears to be importing items from

 3   China, something that he can do from anywhere.  It does not

 4   have to be done in Phoenix.  It does not even have to be done

 5   in the United States.  And he makes a substantial living doing

 6   that.

 7          The defendant is a naturalized citizen of the United

 8   States, but he also has dual citizenship in Egypt.

 9          He has no property here.  Apparently he did not renew

10   the lease on his apartment, it runs out either the end of this

11   month or the end of September.  Although I'm assuming he can

12   rent month to month after that.

13          The FBI did uncover evidence of other bank accounts

14   that were not known to them at the time of the search warrant.

15   They have not had the opportunity to determine if there's any

16   other funds in those accounts.

17          Additionally, there is one additional post I'd like to

18   let the Court know about.  It was on July 13th of 2014 from his

19   Facebook account.  He was speaking to an individual --

20          MR. MORRISSEY:  Your Honor, may I have a continuing

21   objection to the proffer covering anything after the time of

22   the Indictment?

23          THE COURT:  I believe she said it was 2014.

24          MS. SCHEEL:  Yes.

25          THE COURT:  February 2014 -- or, I'm sorry, July 2014.

1    MR. MORRISSEY:  Nonetheless, it has not been disclosed

2  to the defense, and so it is being proceeded by proffer, and it

3  is new information for this Court's determination, for which we

4  have no ability to test it by cross-examination.  That's my

5  objection.

6    THE COURT:  All right.  Your objection is noted.

7  Thank you.

8    MS. SCHEEL:  In this post the defendant wanted this

9  other individual, who apparently was out of the country, to

10  join him in the United States, to go into business with him,

11  and advised that he could go -- come into the United States

12  through Mexico, because the borders are, quote, long and open.

13  So he seems to be aware of the ability to cross the Mexican

14  border both into and out of the United States fairly easily.

15    Could I have a moment, Your Honor?

16    THE COURT:  Certainly.

17    MS. SCHEEL:  So, Your Honor, based on the facts that

18  are in the Complaint and the additional facts that have been

19  proffered today, the Government -- and the presumption that the

20  defendant's both a flight and danger, the Government submits

21  that this defendant -- there are no conditions reasonably -- to

22  reasonably assure the defendant's appearance in court, either

23  here or in the Southern District of New York.  And there are no

24  conditions sufficient to ensure the safety of the community

25  based on these facts and the presumption.

15-8378MJ — August 28, 2015

1          THE COURT:  Thank you, Miss Scheel.

2          When you began your remarks you indicated that the

3   Government asserts that the presumption applies under

4   3142(c)(3) —— did you say (C) or (B)?

5          MS. SCHEEL:  Let me see if I can find it again.

6          (e)(3)(C).  This is a crime of terrorism, and where ——

7   I think it's Count 3 has a sentence of ten years or more.

8          THE COURT:  Thank you.

9          Mr. Morrissey?

10          MR. MORRISSEY:  Your Honor, first as to the entirety

11   of the Government's proffer of statements that were made that

12   are not contained within the Complaint, and they're not

13   contained within the Indictment, I believe the Court should

14   give those very little weight.

15          There is zero foundation tying the defendant to

16   actually being the person who posted that —— those statements,

17   if they were made at all, on his Facebook account.

18          Dealing explicitly with what is in the Indictment and

19   in the charges, what the Indictment says is that Mr. El Gammal

20   communicated through social media.  That, of course, is a First

21   Amendment protected right.  There's no statement as to what was

22   said, or that Mr. El Gammal did anything more than exercise his

23   First Amendment rights.

24          There's no allegation that Mr. El Gammal received

25   military training.

1        There's no allegation that Mr. El Gammal knew that

2   CC-1 was receiving military training.  The Government does not

3   even allege that Mr. El Gammal knew that CC-1 was traveling to

4   Turkey or Syria.  The Government merely says that Mr. El Gammal

5   knew that the individual may travel -- or discussed the

6   individual traveling to the Middle East.

7        There is no specification of any overt act that

8   Mr. El Gammal did with respect to any military type training.

9        The statement today by Miss Scheel that the Complaint

10  alleges that CC-1 referred to joining ISIL as a job, I believe

11  that's a misstatement.  In the Complaint at paragraph 30 it

12  certainly refers to communications from CC-1, but then the

13  affiant goes on to say it is his belief.  In other words, it's

14  his inference that CC-1 is making a reference to ISIL.

15       On its face those statements certainly do not indicate

16  any knowledge on the part of Mr. El Gammal that CC-1 was doing

17  anything on behalf of ISIL.  So that inference simply goes too

18  far for today.

19       There is a presumption in this case, but the

20  presumption is defeated by the length of his residence in

21  Arizona and in the United States, and his steady employment.

22  And I have a cite for that, which is *U.S. v. Giampa,* 755

23  F. Supp. 665, Western District of Pennsylvania, 1990.

24       The defendant has lived lawfully in the United States

25  for 18 years.  He's a United States citizen, and has been a

1   citizen for seven years.  He has stable employment.  He's owned

2   his own business for ten years.  He was married for 15 years to

3   a United States citizen.

4           The Government has seized defendant's passport.  He

5   has no ability to travel to a foreign country.

6           Pretrial Services, in expressing concern about

7   familial ties, doesn't specify in depth the extent of those

8   familial ties.  Because he has a sister in Dubai who he speaks

9   to twice a year by telephone.  And his mother.  His mother's a

10  lawful permanent resident of the United States.  That is not a

11  basis from which to conclude that Mr. El Gammal has a basis --

12  or a sanctuary in a foreign country.

13          There are no issues of substance abuse.

14          He's not on any other type of supervision.

15          He has no failures to appear.

16          He's proven he's able to maintain employment and has

17  done so for the last ten years.

18          The other new information from the Government is,

19  apparently that Mr. El Gammal possesses a drone.  There's no

20  allegation that that's a drone with some type of military

21  capability.  And, in fact, hundreds of thousands of Americans

22  now possess drones.

23          There's no allegation he possessed a firearm.  We will

24  proffer that Mr. El Gammal does not, and that he shoots at the

25  Scottsdale Gun Club.  That's the explanation for the

1    ammunition.  But there's no -- there's no -- there's no

2    firearms and there's no weapons.

3         The Court has before it knowledge of Mr. El Gammal's

4    current and active ongoing business.  Even the AUSA

5    acknowledges that he does business and he's currently doing

6    business with China.  This is not an individual who is in the

7    process of ending his business commitments or his employment or

8    leaving Arizona.

9         The conditions then laid out by the Pretrial Services'

10   report, which note that there should be a home assessment to

11   determine if his residence is suitable for location monitoring

12   for this United States citizen, who's not accused directly of

13   doing anything more than participating on social media.  It is

14   entirely proper for this Court to find that Pretrial Services

15   has gotten it right, and allow that evaluation of the home

16   assessment.

17        I would note that Pretrial Services has changed its

18   recommendation as to who is an appropriate third-party

19   custodian.  We were told Wednesday when we left court that

20   there would not be an updated report, now there is.  Okay.

21        So the defense would ask, and has spoken with Pretrial

22   Services, that if the Court permits an evaluation of the home

23   assessment program to determine if it's suitable for location

24   monitoring, that a new third-party custodian be appointed,

25   which would be Mr. El Gammal's ex-mother-in-law.  She is here

1    today.  She is available to be interviewed.

2          Pretrial Services has indicated -- I believe indicated

3    that she can be interviewed today.  I don't know when they

4    would have the results of that report, but she's here and we

5    can get that accomplished today.

6          So the defense would ask the Court to follow the

7    recommendations of Pretrial Services.  There's been no showing

8    that he's a flight risk.  There's no showing certainly by clear

9    and convincing evidence that he's a danger.  This is a

10   long-time citizen, long-time self-employed citizen of the

11   United States.

12         He will have to answer to these charges in New York,

13   but he should be permitted to do so under his own power and to

14   get to New York on his own.

15         May I have one moment, Your Honor?

16         THE COURT:  Certainly.

17     (Discussion held off the record)

18         MR. MORRISSEY:  My final point, Your Honor, is that we

19   would proffer that, as proof that Mr. El Gammal has no plans to

20   leave the United States, in addition to not having any

21   passport, he does have three shipments from China coming in

22   overseas within the next couple weeks.  We believe

23   investigation would show that his business is active and

24   ongoing, and not in the process of ending.

25         THE COURT:  Mr. Morrissey, can you tell me more about

1    Mr. El Gammal's employment?  The Pretrial Services' report

2    indicates he's self employed buying and selling vehicles since

3    2005.  The Government made a reference to China, as you have as

4    well.  Can you explain more to me about this business and how

5    it's tied to Phoenix?

6            MR. MORRISSEY:  Yes.  He's, I believe --

7            Let me consult with him, because I want to make sure

8    everything I say is accurate.

9        (Discussion held off the record.)

10           MR. MORRISSEY:  Your Honor, the nature of the

11   equipment coming from China tends to be machinery that enables

12   Mr. El Gammal to work on cars that he then fixes and sells out

13   of the physical structure noted in the Pretrial Services'

14   report.

15           THE COURT:  And that is what's listed as his

16   employment address --

17           MR. MORRISSEY:  Yes, Cars R US.

18           THE COURT:  -- on 27th Avenue?

19           MR. MORRISSEY:  Yes, Your Honor.

20           THE COURT:  And that's a warehouse or a structure of

21   some sort --

22           MR. MORRISSEY:  Yes.

23           THE COURT:  -- where he maintains automobiles?

24           MR. MORRISSEY:  Yes.

25           THE COURT:  Does he own that property or lease it?  Or

——— 15-8378MJ – August 28, 2015 ———

1    what's his connection to it?

2          MR. MORRISSEY:  I don't believe he owns it.  May I

3    check?

4      (Discussion held off the record.)

5          MR. MORRISSEY:  Your Honor, he pays rent to the owner.

6          THE COURT:  Thank you, Mr. Morrissey.

7          Miss Scheel?

8          MS. SCHEEL:  Your Honor, I just want to clarify one

9    thing, that Mr. Morrissey indicated that there's no evidence

10   that the defendant knew that CC-1 went to Syria to fight for

11   ISIL.  Specifically in the Complaint paragraph 36, the affiant,

12   Agent Nguyen, viewed the publically available portion of CC-1's

13   Facebook account, and in it is a picture of CC-1 standing in

14   front of what appears to be a mural of a Syrian political

15   figure which has been riddled with bullets.  And in the

16   photograph CC-1 is wearing camouflage pants and raising his

17   index finger in a gesture which, based on the affiant's

18   training and experience, he understands to be a sign of support

19   for ISIL.

20          In addition, in the search warrant of CC-1's Facebook

21   account, in May of 2015 CC-1 had a conversation with the

22   defendant in which he said that his training was progressing as

23   expected.  Specifically that he said, I'm doing well, and I

24   just want to let you know I'm safe and secure and everything is

25   going according to plan.

1        THE COURT:  Miss Scheel, you had referenced some

2    social media exchanges from May 2015, and information that was

3    updated pursuant to a search warrant as recently as yesterday

4    or earlier this week.  That information was not included in the

5    Statement of Probable Cause in the Complaint, it was

6    information with respect to transferring funds out of the

7    country, or possibly doing so, and information that could be

8    interpreted as coded communications indicating a plan or a

9    willingness or a desire to travel out of the United States.

10        That is fairly critical information if it can be

11    substantiated.  Can the Government disclose or produce that

12    information to Mr. Morrissey, like today or Monday morning?

13        MS. SCHEEL:  I can produce especially the one that's

14    in English.  Some of them are in Arabic and have not -- have

15    only had a preliminary translation and not a final translation.

16    I can show him the preliminary translation.  FBI has requested

17    that the preliminary translation not be turned over for

18    discovery purposes at this point.  I'm just proffering what the

19    preliminary translation was.

20        THE COURT:  And so which of those communications is

21    based on the preliminary translation?

22        MS. SCHEEL:  The one that is in English is the one

23    about him wanting to go to Syria in mid August, and talking

24    about the parking lot at CC-1's job.  That's in English.

25        THE COURT:  All right.  So I'm going to continue the

───── 15-8378MJ – August 28, 2015 ─────

1  detention hearing.  I'm going to direct Pretrial Services to do

2  two things.

3          First, interview Mr. El Gammal's former mother-in-law

4  to see if she is an appropriate third-party custodian, and to

5  conduct the necessary investigation.

6          I'm also going to direct Pretrial Services to conduct

7  an investigation of Mr. El Gammal's residence to determine if

8  it is suitable for location monitoring.

9          I'm going to ask them to make this a priority, as

10  Mr. El Gammal has been detained since earlier this week.

11          And I'm going to continue the detention hearing until

12  Tuesday morning.  It is Friday, late afternoon.  That will give

13  Pretrial Services one business day to accomplish this.  And to

14  provide supplemental report to the Court and to counsel with

15  the results of both of those matters, whether there's an

16  appropriate third-party custodian.  The defendant has suggested

17  his former mother-in-law.  And whether his residence is

18  suitable for location monitoring.

19          I am not making any determination on release at this

20  time.  I don't think I can do so without that information.

21          I'm also going to direct the Government to disclose to

22  the defendant the communications that are in English.  If you

23  do not disclose to them the other preliminary translations, I'm

24  not going to rely upon any information that has not been

25  disclosed to them when we reconvene on Tuesday.

1          And I'm not making a decision now, which I know

2     prevents either party from appealing a decision because it

3     doesn't exist at this point.  So we'll deal with that issue on

4     Tuesday.

5          In the event that I should decide to release

6     Mr. El Gammal, and the Government doesn't appeal or object that

7     decision, I'm going to order that the hearing be bag and

8     baggage, and that Mr. El Gammal's belongings be brought to the

9     courthouse with him.  If I don't order that he be released,

10    then his belongings can be returned to CCA with him.  If the

11    Government seeks a stay and appeal we can address that at that

12    time as well.

13         As Judge Boyle advised the Government earlier this

14    week, should I decide to release Mr. El Gammal and the

15    Government seeks a stay, I'm not going to grant a long stay.

16    So the Government needs to be prepared to file immediately.

17    And I will probably give them 24 to 48 hours for a stay.

18         MS. SCHEEL:  That's fine, Your Honor.  I've spoken to

19    the Assistant U.S. Attorneys in the Southern District of

20    New York.  They've indicated they will be filing an appeal, and

21    they have an appeal ready.

22         THE COURT:  They're ready to proceed?  Okay.

23         So we'll convene at 10:30, I believe, 10:30 Tuesday

24    morning.  And that's early enough in the day that, depending on

25    what occurs, the prosecutors in New York can take whatever

UNITED STATES DISTRICT COURT

1    steps they wish to take that day.

2            I see the Pretrial Services Officer.

3            I've given you a short time frame, is that going to be

4    sufficient for you to accomplish the task?

5            MR. LARA:  That's enough time, Your Honor.

6            THE COURT:  All right.  Thank you.  Thank you,

7    Mr. Lara.

8            Mr. Morrissey?

9            MR. MORRISSEY:  Your Honor, I'm going to ask two

10   things.

11           One, may I have a two-sentence rebuttal to the

12   paragraph 36 allegation?

13           THE COURT:  Mr. Morrissey, I think I already know your

14   rebuttal, which is that the paragraph 36 information relates to

15   communications from July of 2015, which was long after CC-1 is

16   alleged to have left the United States and traveled to Turkey,

17   which means it would be long after the time frame in which the

18   Government would be asserting that he knew -- that

19   Mr. El Gammal knew that CC-1 was going to go to Turkey.

20           MR. MORRISSEY:  And there's no evidence that

21   Mr. El Gammal saw it, as opposed to CC-1 posting it.  The FBI

22   saw it.  There's no evidence that Mr. El Gammal saw it.

23           May I confer with the AUSA?  Because I'm going to ask

24   the Court to modify its order in one respect, and I want to see

25   if the Government objects.

1      THE COURT:  Certainly.

2    (Discussion held off the record.)

3      MR. MORRISSEY:  Your Honor, with respect to which

4  house should be evaluated for home monitoring, since

5  Mr. El Gammal's lease was up and he was in the process of

6  moving, we don't have a residence to offer Pretrial to

7  evaluate.

8      Since we have proposed a third-party custodian, we

9  would ask that that be the house that be evaluated for home

10  monitoring.

11      THE COURT:  Mr. Morrissey, the Pretrial Services'

12  report indicated that Mr. El Gammal's mother was residing with

13  him.  Is she residing with him in the leased property, which is

14  -- apparently he's about to leave or vacate?

15      MR. MORRISSEY:  She is now residing with the ex-wife.

16  But that's not the same location of the custodian we're

17  proposing, who is the ex-mother-in-law.

18      THE COURT:  All right.  And the other information that

19  I will want from Pretrial Services is, who will be residing in

20  that residence.  Presumably Mr. El Gammal's former

21  mother-in-law, and Mr. El Gammal if it's an approved residence,

22  and anyone else who's going to be residing there, need to know

23  that as well.

24      All right.  We'll modify that then.  The Pretrial

25  Services will investigate that residence and will obtain the

1    address information today from Mr. El Gammal's former

2    mother-in-law, who you reported is here in the courtroom.

3              Also, just to be clear, the detention hearing is

4    continued until next Tuesday, September 1st, 2015, at

5    10:30 a.m.  It will be here in courtroom 304.

6              Is there anything else that we need to address this

7    afternoon?

8              MR. MORRISSEY:  No, Your Honor.

9              MS. SCHEEL:  No, Your Honor.

10             THE COURT:  All right.  Thank you.

11             The hearing's adjourned.

12

13                              -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                         C E R T I F I C A T E

5

6          I, CANDY L. POTTER, court-approved transcriber,

7    certify that the foregoing is a correct transcript from the

8    official electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11         DATED at Phoenix, Arizona, this 18th day of

12   September, 2015.

13

14

15

16                              s/Candy L. Potter__
17                              Candy L. Potter

18

19

20

21

22

23

24

25